# HENRY T. BLOW *et al.*

## *v.*

# JARED GAGE *et al.*

1. ASSIGNMENT FOR THE BENEFIT OF CREDITORS—*power to make, and give preferences.* A debtor in failing circumstances may make an assignment for the benefit of his creditors, and in so doing, he may make a preference in favor of a portion of his creditors.

2. SAME—*must be in good faith.* But to be valid, it must be done in good faith; for, if intended to delay creditors, or otherwise for fraudulent purposes, or if the preference be a secret trust, it is void.

3. SAME—*will be rigidly scrutinized.* Transactions of this character are required to be fairly and honestly made, and, to that end, they will be rigidly scrutinized.

4. CHANCERY PRACTICE—*proof requisite. to overcome a sworn answer.* Where an answer to a bill in chancery is required to be made under oath, and is responsive to the allegations of the bill, it must be received as true, unless disproved by the evidence of two witnesses, or that of one and corroborating evidence amounting to the evidence of another, such answer being evidence of a higher grade than that of a single witness.

5. ASSIGNMENT FOR THE BENEFIT OF CREDITORS—*of particular words in the deed.* It is no objection to a deed of assignment, that it contains this language: "deducting and retaining all such costs, charges, *damages*, expenses and disbursements, as shall be sustained, incurred, or reasonably due, for or in relation to the execution of the trusts." The use of the word "damages" therein does not vest in the trustee power to squander the assets, by the charge of fictitious damages.

6. SAME — *reasonable costs and charges attending the execution of the trust allowed — whether provided for in the deed or not.* The law allows all reasonable charges, costs, expenses and disbursements, to be paid out of the fund, but they are always subject to be reviewed by a court of equity; and such disbursements will be allowed, whether provided for in the deed or not.

7. SAME — *damages awarded against a trustee — when will be allowed.* Where a trustee, in an effort to execute his trust justly, renders himself liable to damages, which are awarded against him, he will be allowed to retain the amount thereof out of the fund.

8. SAME — *reservation of the portion of the fund.* Where the schedule of unpreferred creditors contained this item, "Jacob Baker, house account, $11.93," and it appeared that one of the persons executing the deed was of the same name, this court will not presume that they are one and the same person, in the absence of all proof of the character of the debt, or of who such person is.

9. SAME — *employment of the debtor — when will not be regarded as a badge of fraud.* Where the trustee employed the debtor to assist him in the settlement of the affairs of the firm, the management of the trust fund remaining strictly under the control of the trustee, such employment will not be considered as a badge of fraud, unconnected with other facts tending to prove fraud.

10. SAME — *of a debt due to a former partner.* The fact that a debtor, making an assignment for the benefit of his creditors, includes in the list of preferred creditors a debt fairly and honestly incurred by him, in buying out a former partner, and for money loaned to him by such retiring partner after his withdrawal, cannot be regarded as a fraud upon the creditors.

11. SAME — *insolvency — what facts not sufficient proof of — to charge a retiring partner with a fraudulent design in selling out his interest.* It is no evidence that a firm is insolvent, because, if forced to wind up its business at a particular time, it would be unable to pay all of its liabilities. And it is no fraud upon the creditors, for one of its members to sell out to the other partners at such a time his interest in the partnership, and to be so there must be proof of such fraudulent design.

12. SAME — *of purchases made shortly before an assignment, arriving afterward, go to the general fund.* Purchases made by a firm some time before an assignment, arriving subsequently, the title thereto vests in the assignees, the seller having failed to exercise the right of stoppage *in transitu.*

13. SAME — *notice of failure need not be given.* There is no rule of law that requires a debtor to give notice of his failure.

14. SAME — *purchases before assignment — what will not be regarded as having been fraudulently made.* Purchases made by a party, on credit, at a time when he knew he could not pay his debts, will not, for that reason alone, be regarded as fraudulent.

15. SAME — *purchases made in contemplation of an assignment — fraudulent.*

14 — 44TH ILL.

But the rule is otherwise as to purchases made in contemplation of an assignment.

16. SAME—*fraud must be proved.* The fraudulent design of a debtor in making an assignment must be proved, and cannot be established by mere suspicion; but can only be sustained upon satisfactory proof of the fact.

WRIT OF ERROR to the Superior Court of Chicago.

The opinion states the case.

Messrs. STEELE & HERBERT, for the plaintiffs in error.

Messrs. GOODWIN, LARNED & GOODWIN, for the defendants in error.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

It appears from the record in this case, that, for about three years previous to the 1st of February, 1859, Baker, Phillips, Stoutenburgh and Innis were partners in a wholesale drug store in Chicago, under the name of Baker, Innis & Co. That the capital stock put in was about $18,000, and was contributed equally by the partners except Stoutenburgh, who was to contribute services. In carrying on the business, the firm, from time to time, borrowed money to the amount of $40,000 to $50,000. These loans were effected by the indorsement of friends in New York, and were renewed in the same manner at their maturity.

On the 1st of February, 1859, Innis sold out his interest in the firm of Baker, Innis & Co. to the other members of the firm. They agreed to give him $6,000 for his interest, good will, etc., in the firm. They continued the business under the style of Baker, Phillips & Co. A notice of the dissolution of the former partnership, and of the continuance of the business by the new firm, was published. At the time he sold out, having drawn less from the firm than the other members, to equalize his account with theirs, they gave him $1,254.83. They afterward obtained from him $5,480 for the purpose of paying debts of the new firm.

On the 12th of November, 1859, the firm made a general assignment to Gage and Wilkinson for the benefit of creditors, they having either paid or renewed all of the debts of the old firm. The debts arising for money borrowed on the accommodation paper of their friends in the east had been renewed, as they matured, in the name of the new firm. By the assignment, these debts for money loaned on the indorsement of eastern friends, and the debt to Innis for money obtained from him, and the sum they owed on the settlement of their accounts, were made a first and preferred class; the other debts of the firm were placed in a second class, to be paid out of the remainder after paying the first class, or, if not sufficient, then to be paid *pro rata*. The assignees entered into possession, and carried on the business, so far as selling the stock was concerned, in the usual manner of selling for cash. After thus disposing of the assets for about one year, the assignees sold the remainder of the stock to Ward for the sum of $30,000, delivered to him the possession, and he continued Baker, Phillips and Stoutenburgh as clerks in the store, as they had been under the assignees.

Complainants sued the firm and obtained judgments, but were unable to obtain satisfaction of executions issued thereon. They thereupon filed their bill, alleging that the firm was insolvent when Innis sold out to his partners; that they were aware of the fact, and adopted that course for the purpose of defrauding their creditors, and to enable Innis to avoid liability for their debts; that the accommodation indorsers in the east knew the condition of the firm, and were parties to the fraud; that the subsequent assignment, the preference made to creditors, the sale of the assigned property to Ward, and the preference to the first class creditors, were all intended to carry out the fraudulent agreement; that Innis, by reason of the fraud, is still liable for the payment of the debts of the old firm; that the whole transaction originated in a corrupt agreement between Innis and them for the benefit of the parties, and is a fraud on the new creditors. The bill requires the anwers to be under oath. The answers were so made and

filed. Defendants deny all manner of fraud in the entire transaction, or in any one of its parts, but insist that it was in every thing made in perfect good faith. After hearing the evidence on a trial in the court below, a decree was rendered dismissing the bill at costs of complainants. To reverse which, this writ of error is prosecuted.

That a debtor may make a general assignment for the benefit of creditors, no one can deny. And it is equally true, that, in doing so, the law permits him to make a preference in favor of a portion of his creditors. But to be valid and binding, it must be done in good faith. If the assignment be intended by the debtor to hinder and delay his creditors, or otherwise for fraudulent purposes, or if the preference be on a secret trust, then the instrument must fail, and may be declared void. Such transactions, like all others, are vitiated by fraud. To become binding, fairness and honesty of purpose are indispensable ; and such transactions are subjected to the most rigid scrutiny. The interest of commerce requires that the law shall be so administered, that fair and just dealing shall be secured.

The case under consideration is one involving a considerable amount, and has been fully and ably discussed, and the questions involved have been forcibly presented on both sides. The theory of plaintiffs in error, is, that the entire transaction, in its conception, as well as its execution, was intended to defraud the creditors of the firm of Baker, Phillips & Co. This is the gravamen of the bill. It calls for the answers under oath, and they were so given. According to the plainest rules of chancery practice, such answers, so far as responsive to the bill, become evidence on the trial, — and not only so, but evidence of a higher grade than that of a single witness. It requires the evidence of two witnesses, or that of one and corroborating evidence equal to the evidence of another, to overcome or contradict such an answer. Plaintiffs in error then, by calling for discovery on oath, made the answers of the defendants evidence of that high character. In this case the answers deny all fraud, or intention to commit any, in clear and explicit terms. They declare the transaction to have been fair and

honest in all of its parts. In the face of such answers, then, plaintiffs in error can only rely for a recovery on clear and satisfactory evidence.

If such proof was adduced, we should find it in the testimony of witnesses, or in badges of fraud inhering to the transaction itself, or in both. We have discovered no evidence in this record that the defendants ever declared such a purpose, or any thing which they said from which it could be inferred. If fraud has been established, it is by the transaction itself, viewed in the light of surrounding circumstances.

When the instrument itself is examined, it contains no provision prohibited by law, or which can be held to render it fraudulent. It, in the usual form, assigns the property of the firm to the assignees, declares the preferences, and is executed in the usual mode. It is true the deed contains, in reference to the trustees, this language: " deducting and retaining all such costs, charges, damages, expenses and disbursements as shall be sustained, incurred, or reasonably due for, or in relation to the execution of the trusts." The principal force of the objection is, that the word " damages " leaves the trustees with too much power to squander the assets, by the payment of fictitious damages. We do not perceive that the objection is well taken. The charges, costs, expenses and disbursements attending the execution of the trust, are not specifically enumerated. The law allows such charges upon the fund, but requires them to be reasonable. They are always subject to be reviewed by a court of equity ; and although the deed had not contained such a provision, the law would have authorized the retention of all such reasonable charges.

It is a proposition too plain to admit of doubt, that if the trustees, in an honest effort to execute the trust, were to render themselves liable to damages, and they should be awarded against them on a trial, they would be allowed to retain the amount of such damages. The trustees would have no more discretion in this matter than they would in retaining costs and expenses. In either case they could be compelled to account if the fund was thus improperly perverted. This but

expressed what the law implied. *Campbell* v. *Woodworth*, 24
N. Y. 304. This case is unlike the case of *Heacock* v. *Durand*
(42 Ill. 230), where it was held, that the deed was void because
it allowed counsel fees to be retained by an attorney who was
himself the trustee.

It is again insisted that the assignment is rendered void
because the second schedule of debts directed to be paid con-
tained this item: "Jacob Baker, house account, $11.93." The
record contains no evidence which explains the character of
this debt or who Jacob Baker is. It is, however, insisted, that,
as one of the persons executing the deed of trust is of the same
name, we must therefore infer that they are one and the same
person, and that this item was inserted for the purpose of reserv-
ing a portion of the fund to one of the debtors. Where we see
that this schedule embraced debts to the amount of over
$71,000, we can hardly suppose that so insignificant an item
would have been deliberately inserted with such a purpose.
But we are not authorized to judicially know that the person
named in the schedule is the same person who executed the
deed of trust. Our observation teaches us that it not unfre-
quently occurs that two persons bear the same name. If so
small an item, intended as a reservation, proved to have been
intentionally made in favor of one of the debtors, could be
held to avoid an assignment of such magnitude, there is no
proof in this record that this was to one of the debtors. Had
the person who made the schedule been called as a witness, he
could no doubt have stated whether it was the account of Jacob
Baker, the grantor, or another person, and how and why the
entry was made. But he was not called.

When examined, do the circumstances of the case prove a
fraudulent intent? Are there such badges of fraud as should
invalidate the deed? We see that when the deed was made
the trustees entered into full and complete possession of the
trust property, and proceeded to carry out the trust reposed in
them. This was in conformity with the usual course of busi-
ness, and is what is required. It is true, they employed
the grantors to aid and assist in settling the debts, the sale of

the drugs and the settlement of the business of the firm.  We think, that the evidence shows, that, after the sale of the property, the management of the trust fund was strictly under the control of the trustees, — that the debtors acted under their directions.   This was not a badge of fraud, unconnected with other circumstances tending to prove fraud.

It is insisted, that the fact that the debt to Innis for the amount they agreed to pay him to render their accounts equal, which was preferred, as well as the sum they owed him for borrowed money, and the debt due him for his interest in the firm, being placed in the second class of debts, evinces a fraudulent intent.  We do not see why the firm should not be permitted to provide for paying a former partner who had withdrawn from the firm any sum they fairly owed him.   It cannot be because he had once been their partner.   We are aware of no rule which prevents such persons from transacting ordinary business with each other.   Nor can it be that an indebtedness fairly and honestly incurred in buying out a partner cannot be paid or secured without being regarded a fraud on creditors.

If it is true that the other partners had drawn from the firm more than Innis, we do not see that it was unjust or fraudulent, on the withdrawal of Innis from the firm, for the other partners to agree to pay him an amount to make him equal.   There can be no pretense, that they did not have the right to borrow of him the $5,480 several months after he had ceased to be a partner, or that, when they did so, they could not become legally bound for its payment.   Nor do we discover that it was a badge of fraud to embrace it in the schedule of preferred creditors.   It seems that he put into the firm $6,000 as capital stock when they first went into business; and that would seem to be the sum they, when he withdrew, agreed to pay him at their convenience.   This cannot be held to be a badge of fraud.   Such transactions as these are of frequent occurrence, and are in the usual course of business, and never of themselves, even in the minds of the most suspicious, excite a doubt of their fairness.

It is, however, said, that the firm was insolvent at the time when Innis withdrew, and that all of the partners knew the fact. That the firm might not then have been able, had it been forced into liquidation, to pay all of its liabilities, may be true. And that the same may be said of a large number of business houses of high standing, and which eventually overcame their inability to pay, and cease to exist with large fortunes, there can be no doubt. Such a state of things is inevitable from the very nature of the credit system. If it is a fraud on creditors for a member of a firm to sell out to his partners, because the house would be unable to pay all of its debts if forced to wind up its affairs, it is believed that a large number of partnerships could not be dissolved by a member selling out to his partner. We do not regard such a transaction as fraudulent, and to be held so there should be proof that such was the design. The fraudulent intent is denied in this case, and it is not so clear that they knew the firm would fail, as to render it probable that it was designed for fraudulent purposes. On the contrary, it was no more than reasonable to believe that the parties supposed their firm was in a reasonably safe and healthy condition, and that they could soon recover so as to be easy in their circumstances.

Their indebtedness was a little more than their assets, which, after the disastrous year they had just passed, was not surprising; and, as the partners deny that any fraud was intended, this fact does not overcome the denial. Again, if the design was to perpetrate fraud in the manner charged, we are at a loss to understand why it was that Innis loaned the firm $5,480 after all of the indebtedness of the former firm had been paid or renewed, and he entirely released therefrom, and this, too, but a short time before the failure occurred. If the object of the parties in making the sale was to get him released, we are unable to comprehend why he should, after the end had been accomplished, voluntarily advance such a sum, so short a time before the next step was taken by which it is insisted the preference was to be given to a portion of the creditors.

It is urged, that, as the firm had ordered goods that had not been received, their appropriation to the general fund was a badge of fraud. It seems these articles had been ordered some time before, and had not been received. After the assignment was made, the assignees took these, as well as all other property, into possession for the benefit of the creditors. Upon their arrival, the legal title vested in the assignees, the seller having failed to exercise the right of stoppage *in transitu.* We are aware of no rule of law that required the firm to give notice of their failure. It has never been considered fraudulent for a business house to purchase on credit simply for the reason that they knew that they were unable at the time to pay their debts. If they were to make such purchases in contemplation of making an assignment, it would no doubt be otherwise.

When they were notified that their eastern friends would no longer indorse for them, and that they must protect their paper at maturity, one of the partners immediately went east for the purpose of making other arrangements to sustain their credit, but in this he failed. From the time they received this notice, the book-keeper testifies that no more purchases were made. This would seem to negative the idea that they had previously contemplated an assignment, or that they designed to make purchases with a view to the assignment.

In this case, the evidence is so voluminous, that we cannot discuss it in detail, but must content ourselves by referring to a few of the most prominent portions of the proof. But, after a careful examination of the entire record, we are compelled to say that the plaintiffs in error have failed to prove that the assignment was made in fraud of their rights, or was fraudulent in law or in fact. The transaction bears on its face no evidence of bad faith; and, if there was a secret intent to hinder or delay creditors, it is denied under oath, and the evidence fails to disclose the fact. Fraud must be proved, and cannot be established by mere suspicion. And while the law abhors fraud and crime, at the same time it is unwilling to impute either on slight and trivial evidence, thereby wrong-

fully destroying the character of men worthy of confidence and respect. Such imputations are grave in their character, and should not be lightly made, and should only be sustained on satisfactory evidence.

The decree in the court below must be affirmed.

*Decree affirmed.*